David P. STEVENS, Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent.

No. 99SC121.

Supreme Court of Colorado, En Banc.

June 25, 2001.

Rehearing Denied Aug. 27, 2001.

---

David Kaplan, Colorado State Public Defender, Pamela A. Dayton, Deputy State Public Defender, Denver, CO, Attorneys for Petitioner.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Robert Mark Russel, First Assistant Attorney General, Jerry N. Jones, Special Assistant Attorney General, Appellate Division, Denver, CO, Attorneys for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

In this murder-for-hire case, the defendant, David Stevens, was convicted of first-degree murder, conspiracy to commit first-degree murder, and solicitation to commit first-degree murder, in connection with the February 28, 1993, shooting death of David Seiler.[1] The prosecution's theory was that the defendant engaged John Swiger to kill the victim in order to prevent the victim from testifying against the defendant in an upcoming criminal trial scheduled for April 1993. In that trial, the same defendant, Stevens, was charged with kidnapping and severely beating the same victim, Seiler, in the late evening hours of December 31, 1991, and the early morning hours of January 1, 1992, some thirteen months before the victim was murdered. Following the victim's death but before the defendant was charged in connection with his murder, the defendant was tried and convicted of the kidnapping and assault charges. He was sentenced to imprisonment for life plus eighty years. For his convictions in connection with the murder case now before us, the defendant received a life sentence and two concurrent terms of twenty-four years each to be served consecutively with his previous sentences.

We granted certiorari to determine whether the court of appeals applied a proper Confrontation Clause analysis when it upheld the admission into evidence of the shooter Swiger's confession in Stevens's trial.[2] The court of appeals determined that Swiger's confession was a statement against interest that was inherently trustworthy because it was supported by the following indicia of reliability: (1) the statement was strongly against Swiger's penal interest; (2) the statement was made after Swiger voluntarily waived his Miranda rights; (3) Swiger was not offered any favorable treatment in exchange for making the statement; and (4) the statement contained such detail as to suggest that Swiger had personal knowledge of the crime. *People v. Stevens*, No. 96CA1685, slip op. at 5–7 (Colo.App. Nov. 19, 1998) (not selected for official publication). We conclude that the appellate court did not err. Swiger's statement was admissible because it contained sufficient guarantees of trustworthiness.

## I.

At the time of the crimes, the defendant Stevens was a man in his mid-forties who operated an illegal drug business from his Aurora home and recruited numerous individuals to assist him in his drug operations. Some, like the victim Seiler and his girlfriend, were young people in their teens or early twenties; the victim was twenty years old when he died. Other participants were adults in their thirties who, like the shooter Swiger and his girlfriend, claimed to have ties to motorcycle gangs. The defendant's home was the focus of activities related to the illegal drug trade, such as repackaging drugs for resale, and also was a place for socializing among people involved in the defendant's illicit business.

The chain of events that culminated in the victim's death began in December 1991 when the defendant's home was burglarized and drugs and money were stolen. The defendant, believing that the victim was responsible for the theft, arranged to have the victim kidnapped. On December 31, 1991, the de-

---

1. Stevens was convicted of: (1) first-degree murder under section 18–3–102, 6 C.R.S. (2000); (2) conspiracy to commit first-degree murder under section 18–2–201, 6 C.R.S. (2000); and (3) solicitation to commit first-degree murder under section 18–2–301, 6 C.R.S. (2000).

2. We granted certiorari on the following issue:

 (1) Whether the court of appeals erred in conducting its Confrontation Clause analysis.

fendant and two companions held the victim at gunpoint for several hours in the defendant's house. The three severely beat the victim while they interrogated him about the burglary.

In response to questioning by the defendant, the victim listed several people who he said were responsible for stealing the defendant's drugs and property. At some point during the assault, the defendant and the victim both spoke by telephone to three teenage girls who the victim claimed were involved in the burglary of the defendant's house. The defendant informed the girls that he would kill the victim if they did not help him find his drugs. One of the girls, however, called the police who rescued the victim and arrested the defendant. The defendant subsequently was charged with several crimes related to this incident.

In the weeks immediately following the abduction and beating, the victim withdrew from contact with the defendant. Over time, however, the victim and his girlfriend were drawn into the defendant's activities. In fact, in the month preceding his death, the victim and his girlfriend visited the defendant's house on a daily basis. The victim frequently said that he intended to lie at defendant's pending trial on the kidnapping and assault charges and that he would deny that the defendant had harmed him. The defendant appeared to have reconciled with the victim and was described as treating him like a son.

Throughout this time period, however, the defendant contacted different people in an effort to find someone who would kill the victim prior to the kidnapping and assault trial. Two of these individuals testified at the trial in this case. One testified that he refused the defendant's request to kill the victim.

The second man, Jeff Cayouette, testified under a grant of immunity that he had agreed to murder the victim in exchange for a vintage motorcycle. According to Cayouette, the defendant supplied him with a loaded handgun to commit the crime. In October 1992, after receiving the gun, Cayouette asked the victim to come along with him to buy some drugs. He then drove the victim to a suburban residential area. Cayouette parked in the residential area and talked with the victim for over an hour as they waited to meet their drug contact. While they were waiting, Cayouette asked the victim to help him check his car's fan belt. When the victim got out of the car to look under the hood, Cayouette pulled out a gun and shot at him three times. All three shots missed, however, and the victim was able to run away. The victim escaped to a nearby house and telephoned the police, who later found shell casings and other evidence supporting his report of the shooting attempt. No charges were filed in the incident.

The gunman in this case, John Swiger, knew the victim through the defendant's drug operation for about one month before the murder occurred. Swiger told the defendant and his associates that he was an enforcer for a motorcycle gang. At trial, Swiger's girlfriend testified to overhearing conversations between the defendant and Swiger in which the two men agreed that Swiger would commit the murder. The defendant allegedly promised to pay Swiger $5000 before and $5000 after the murder took place but it is not clear from the record how much money, if any, changed hands. In his statement admitted into evidence at the trial, Swiger claimed that he was compelled to follow through with the murder because he feared that otherwise the defendant would harm his girlfriend and her children. At other times, however, Swiger claimed to have committed the murder as an act of friendship to help the defendant.

According to Swiger, the defendant provided him with a handgun to use as the murder weapon. After the crime, the defendant dipped the gun in acid and helped Swiger dispose of it by throwing it into a stream. Following the explicit directions given by Swiger, the police recovered the gun. Ballistic tests confirmed that it was the murder weapon and it was placed into evidence at trial.

On the day of the murder, one of the defendant's close associates, Corey Ivey, took the victim, his girlfriend, and a sixteen-year

old girl, Tina Parks, out to dinner. Ivey drove the victim, his girlfriend and Parks to dinner in the defendant's truck. Later the same evening, the two couples returned to the defendant's house. The defendant was at home sleeping on the living room couch when they arrived. The defendant purportedly had injured his back and was taking muscle-relaxing drugs that made him drowsy. It was the prosecution's theory that the defendant feigned the injury to provide himself with an alibi for the time when the planned murder occurred. Shortly after the two couples entered the house, the defendant went to sleep in a bedroom and was asleep when the murder was committed.

The murder plan, as arranged by the defendant, required Ivey to send the victim on an errand in the defendant's truck and to notify Swiger when the victim was about to leave so that Swiger could drive to the defendant's house and shoot the victim. Swiger lived just over a mile from the defendant's home. The murder occurred as planned except that Parks accompanied the victim on the errand. Shortly after the two walked out of the front door, Swiger fired two shots, killing the victim instantly. Parks was very close to the path of the gunshots but apparently did not see the shooter. She immediately returned to the house and informed the others about the shooting. Subsequently the police were called and they commenced their investigation.

Shortly after the murder, the police interviewed Swiger and his girlfriend, both of whom denied any involvement in the crime. The couple informed the police that they intended to return to Tennessee with their children and Parks, the only witness to the murder. Soon after the police interview, they moved to Tennessee as planned.

The police investigation of the murder stalled and no charges were filed. In January 1994, the defendant was convicted of kidnapping and assaulting the victim in the

1992 New Year's Eve abduction. The murder case, however, remained unresolved for another year. The investigation was reactivated only after Tennessee law enforcement officials notified Colorado officials of reports that Swiger had been bragging about committing a murder in Colorado. This information led two Aurora police officers to travel to Tennessee to interview Swiger, who was being held on robbery and attempted murder charges in an unrelated crime.

Swiger was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to being interviewed by the officers. During the course of the interview, Swiger admitted that he murdered the victim after being solicited to do so by the defendant. The interview was recorded on audiotape and was also transcribed. In addition, Swiger wrote and signed a short confession. At the defendant's trial, the tape recording was played for the jury although it is not in the record on appeal. The transcript of the interview and the written statement also were admitted into evidence. It is the admission of this evidence (collectively referred to as Swiger's statement) that is at issue in the case now before us.

## II.

We agree with the court of appeals' conclusion that Swiger's statement falls within the exception to the hearsay rule for declarations against penal interest by an unavailable witness. *See* CRE 804(b)(3).[3] Swiger refused to testify at trial, asserting his Fifth Amendment privilege against self-incrimination, and as such was an unavailable witness. *See Lee v. Illinois*, 476 U.S. 530, 549–50, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). Also, by making the statement, Swiger clearly exposed himself to liability for murdering the victim. Therefore, we address our review to the court of appeals' analysis of whether the admission of Swiger's statement violated the defendant's rights under the Confrontation

---

**3.** CRE 804(b)(3) defines a statement against interest as follows:

A statement which ... at the time of its making ... so far tended to subject [the declarant] to ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Clause of the Sixth Amendment to the United States Constitution.[4]

### III.

■■■ Although an out-of-court statement may be admissible because it falls within an exception to the hearsay rule, the statement nevertheless must be excluded at a criminal trial if admitting it into evidence would deprive the defendant of his constitutional right to be confronted with the witnesses against him. U.S. Const. amend VI; *People v. Newton,* 966 P.2d 563, 572–73 (Colo.1998); *Blecha v. People,* 962 P.2d 931, 941 (Colo.1998); *see also Dutton v. Evans,* 400 U.S. 74, 80–82, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (applying the Sixth Amendment right to confront witnesses to state criminal prosecutions). The Confrontation Clause only permits the admission of hearsay evidence where " 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.' " *Lilly v. Virginia,* 527 U.S. 116, 136, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (quoting *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). To meet this requirement, out-of-court declarations offered against a defendant in a criminal prosecution are admissible only if the prosecution demonstrates that the declarant is unavailable to testify and the declarations either fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness."[5] *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (creating the two-part test for determining whether a hearsay statement is considered sufficiently dependable to be admitted into evidence without the rigorous testing of cross-examination); *see also Newton,* 966 P.2d at 574 n. 13; *Blecha,* 962 P.2d at 941.

It is undisputed that at the defendant's trial Swiger, having declared his intent to exercise his constitutional right against self-incrimination, was unavailable to testify for purposes of our Confrontation Clause analysis. The People argue that Swiger's statement was admissible because it fell within a firmly rooted exception to the hearsay rule, namely the exception for declarations against interest by an unavailable witness. *See* CRE 804(b)(3). Under the facts of this case, we reject that contention. We then examine the second prong of the *Roberts* test and find that the statement is admissible because it has adequate guarantees of trustworthiness.

### A.

■■■ Our previous case law has implied that Colorado's hearsay exception for statements against interest by an unavailable witness is not firmly rooted. *Newton,* 966 P.2d at 574 n. 13 (Colo.1998); *see also People v. Drake,* 785 P.2d 1253, 1256 (Colo.1989) (requiring independent evidence to show that a statement against interest that inculpated the accused was reliable, thereby implicitly recognizing that CRE 804(b)(3) is not a firmly rooted exception to the hearsay rule); *People v. Fincham,* 799 P.2d 419, 422 (Colo. App.1990) ("While it is true that reliability *may* be inferred where the evidence falls within a firmly rooted exception, a declaration against penal interest is too large a class for meaningful Confrontation Clause analysis.") (citation omitted). Notwithstanding these cases, the People argue that the Supreme Court has left open the possibility that the hearsay exception for declarations against interest by an unavailable witness may be considered a firmly rooted hearsay exception when the statement at issue is "genuinely self-inculpatory." *Lilly,* 527 U.S. at 146, 119 S.Ct. 1887 (Rehnquist, C.J., concurring).

In *Lilly,* the defendant, Benjamin Lilly ("Benjamin"), went on a crime spree with his brother Mark Lilly ("Mark") and Mark's roommate. *Lilly,* 527 U.S. at 120, 119 S.Ct. 1887. Over the course of two days, the trio committed a string of robberies and thefts.

---

**4.** The defendant premised his argument on his Sixth Amendment right under the United States Constitution "to be confronted with the witnesses against him."

**5.** Statements that fall within a firmly rooted hearsay exception are considered to be trustworthy such that cross-examination would not add to their reliability. *Idaho v. Wright,* 497 U.S. 805, 820–21, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

*Id.* When their car broke down, the three men stole a car and abducted and murdered the car's owner. *Id.*

After the three men were taken into custody, Mark made a statement to the police in which he confessed to being involved in several of the minor thefts. *Id.* at 121, 119 S.Ct. 1887. Nevertheless, he maintained that he took no part in the more serious thefts or the murder. *Id.* Mark also stressed that he was drunk during the entire crime spree. *Id.* Police officers informed Mark that he faced a life sentence unless he broke "family ties." *Id.* In response, Mark acknowledged that he would be sent to the penitentiary for his involvement in the crime spree, however, he informed the officers that it was his brother Benjamin who committed the more serious crimes including the murder. *Id.*

At Benjamin's subsequent trial for capital murder, Mark exercised his Fifth Amendment right against self-incrimination and declined to testify. *Id.* Over Benjamin's objections, the trial court admitted into evidence an audio recording of Mark's statement. *Id.* at 122, 119 S.Ct. 1887. The court ruled the recording was admissible under the exception to Virginia's hearsay rule for declarations against interest made by an unavailable witness. *Id.* at 121–22, 119 S.Ct. 1887. The Supreme Court of Virginia upheld Benjamin's conviction, finding that Mark's statement was a statement against interest by an unavailable witness and therefore fell within Virginia's declaration-against-interest exception to the hearsay rule. *Id.* at 122, 119 S.Ct. 1887. The court also held that Virginia's declaration-against-interest hearsay exception was a firmly rooted hearsay exception so that the admission of a statement against interest would not violate the Confrontation Clause. *Id.*

In a plurality decision, the Supreme Court reversed the judgment and remanded the case for a new trial. *Id.* at 140, 119 S.Ct. 1887. The court noted that statements falling within a hearsay exception are admissible only if the hearsay exception at issue is a firmly rooted exception or if the statement is supported by adequate guarantees of trustworthiness. *Id.* at 124–25, 119 S.Ct. 1887. Four justices held that an accomplice's con-

fession, which inculpates the criminal defendant, does not fall within a firmly rooted hearsay exception. *Id.* at 134, 119 S.Ct. 1887. (Stevens, J., delivering an opinion in which Souter, Ginsburg, and Breyer, JJ., joined). Therefore, the four justices held that the confession was inadmissible under the Confrontation Clause unless there was evidence in the record guaranteeing its trustworthiness. *Id.* The justices found that there were not adequate guarantees of trustworthiness in the record and therefore reversed the Virginia Supreme Court's decision. *Id.* at 139–40, 119 S.Ct. 1887.

Three justices found that those portions of Mark Lilly's statement that incriminated his brother were not "genuinely self-inculpatory" and would have left open the issue of whether "custodial confessions that *equally* inculpate both the declarant and the defendant" are within a firmly rooted hearsay exception. *Id.* at 146, 119 S.Ct. 1887 (Rehnquist, C.J., O'Connor, Kennedy, JJ., concurring) (emphasis added). Two justices concurred separately. Justice Scalia concluded that the introduction at trial of a tape recording of the declarant's statement, in which he stated that the defendant committed the charged murder, was a "paradigmatic Confrontation Clause violation." *Id.* at 143, 119 S.Ct. 1887 (Scalia, J., concurring). Justice Thomas agreed with Chief Justice Rehnquist, finding that "the lower courts did not analyze the confession under the second prong of the *Roberts* inquiry ... and therefore [I] see no reason for the plurality to address an issue upon which those courts did not pass." *Id.* at 143–44, 119 S.Ct. 1887 (Thomas, J., concurring)(quotations and citation omitted).

Prior to *Lilly*, the Supreme Court held that an accomplice's statement against interest, made to a fellow inmate, inculpating a co-defendant was admissible and did not violate the Confrontation Clause. *Dutton*, 400 U.S. at 86–89, 91 S.Ct. 210. Confessions made to fellow prisoners, family members, and friends are distinguishable from custodial confessions taken by law enforcement officers with a view to prosecution. *See Lilly*, at 146–47, 119 S.Ct. 1887 (Rehnquist, C.J., concurring). Therefore, even after *Lilly*, such confessions may be considered as falling

within a firmly rooted hearsay exception. The case now before us is something of a hybrid. Swiger's original admissions were made to acquaintances but the evidence admitted at trial was his custodial confession to law enforcement personnel.

The People argue that we should follow the decision of the New Mexico Supreme Court in *State v. Gonzales,* in which the court found that a statement against interest that equally inculpated the declarant and the accused fell within a firmly rooted hearsay exception. 128 N.M. 44, 989 P.2d 419, 423–24 (1999). *Gonzales,* however, involved a statement by a co-defendant made to fellow gang members, not to the police while the declarant was in custody. 989 P.2d at 421. As discussed above, such statements against interest may be considered to come within a firmly rooted exception to the hearsay rule. *See Lilly,* 527 U.S. at 147, 119 S.Ct. 1887 (Rehnquist, C.J., concurring) ("[S]tatements to fellow prisoners, like confessions to family members or friends, bear sufficient indicia of reliability to be placed before a jury without confrontation of the declarant."); *cf. Dutton,* 400 U.S. at 87, 91 S.Ct. 210 (considering the factor that a statement against interest made to a fellow prisoner was not made in the "coercive atmosphere of official interrogation"). *Gonzales* does not address the fact situation contained in this case. Here, although Swiger came to the attention of the police because of confessions he made to acquaintances, the actual statement admitted into evidence was made by Swiger, the unavailable declarant, to police officers during custodial interrogation. Thus, the facts of this case do not fit within the narrow category of "firmly rooted" hearsay that the Supreme Court has suggested may exist for a co-defendant's out-of-court statement.

◼ The one area of agreement in *Lilly* is that custodial confessions by a co-defendant inculpating the accused are viewed with "special suspicion" because the co-defendant has a powerful motivation to exonerate himself and implicate the defendant. *Lilly,* 527 U.S. at 131–32, 146, 119 S.Ct. 1887. Indeed, the Supreme Court has consistently found that an accomplice's custodial confession, which incriminates the accused, is to be viewed with suspicion and considered presumptively untrustworthy. *Lee,* 476 U.S. at 541, 106 S.Ct. 2056; *Douglas v. Alabama,* 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Crawford v. United States,* 212 U.S. 183, 204, 29 S.Ct. 260, 53 L.Ed. 465 (1909); *see also Williamson v. United States,* 512 U.S. 594, 599–601, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Likewise, when considering statements against interest made by a co-defendant while in custody, this court has looked for indicia of reliability to overcome the presumptive unreliability of these statements. *Drake,* 785 P.2d at 1256.

We agree that a co-defendant's statements are presumptively unreliable in these situations because of the strong interest a co-defendant has in exculpating his actions while at the same time inculpating another defendant. We also find that such statements are admissible only if they are supported by guarantees of trustworthiness. Therefore, we conclude that a statement against interest by a co-defendant made during custodial interrogation does not fall within a firmly rooted hearsay exception.

◼ Having determined that Swiger's custodial confession does not fall within a firmly rooted hearsay exception, we now must decide whether the statement has sufficient guarantees of trustworthiness to be admissible.[6] *Lilly,* 527 U.S. at 134, 119 S.Ct. 1887

6. The presumptive unreliability of a co-defendant's confession may be rebutted. *Lilly,* 527 U.S. at 137, 119 S.Ct. 1887; *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). This presumption may be rebutted and the statement against interest admitted if the co-defendant's statement is genuinely self-inculpatory and is supported by guarantees of trustworthiness. *Earnest v. Dorsey,* 87 F.3d 1123, 1134 (10th Cir.1996) (finding that the admission of an accomplice's confession that was "truly self-inculpatory" did not violate the Confrontation Clause); *Gabow v. Commonwealth,* 34 S.W.3d 63, 78–79 (Ky.2000) (stating that when a statement is "truly self-inculpatory" this is a guarantee of trustworthiness); *State v. Marshall,* 136 Ohio App.3d 742, 737 N.E.2d 1005, 1009 (2000) ("A voluntary confession, not made pursuant to a deal with the prosecution, and which implicates both the accomplice and the defendant has sufficient *indicia* of reliability."); *State v. Franco,* 151 Or.App. 472, 950 P.2d 348, 353 (1997) (accomplice's confession admissible where accomplice exposed himself to equally serious criminal liabil-

(finding that although an accomplice's statement inculpating the defendant is not within a deeply rooted hearsay exception such a statement may be admissible if it satisfies the second prong of the *Roberts* test). We now proceed to that next step.

### B.

■■■■ The question before us then is whether Swiger's statement bore sufficient guarantees of trustworthiness to satisfy the second prong of the *Roberts* test so that its admission does not violate the Confrontation Clause. *Lilly*, 527 U.S. at 133–34, 119 S.Ct. 1887 (finding that while accomplice confessions inculpating a defendant are presumptively unreliable, there is no "blanket ban" on such statements and they are admissible if they meet the second prong of the *Roberts* test); *United States v. Gomez*, 191 F.3d 1214, 1222 (10th Cir.1999) (stating that accomplice confessions are admissible if they have "adequate indicia of reliability"). To decide that question, we look to the totality of the circumstances surrounding the making of the statement. *Wright*, 497 U.S. at 820–21, 110 S.Ct. 3139. To satisfy constitutional standards and to rebut the presumption of unreliability, hearsay evidence must possess "indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 822, 110 S.Ct. 3139; *Newton*, 966 P.2d at 574. However, the Supreme Court has not provided a test for determining whether guarantees of trustworthiness exist and has stated that courts have "considerable leeway in their consideration of appropriate factors." *Wright*, 497 U.S. at 822, 110 S.Ct. 3139.

■■■■ The analysis of whether a hearsay statement is sufficiently reliable to be admissible under the Confrontation Clause is distinct from the analysis for admissibility of evidence under CRE 804(b)(3). *Newton*, 966 P.2d at 574; *see also Dutton*, 400 U.S. at 81–82, 91 S.Ct. 210. However, prior cases analyzing the trustworthiness of hearsay statements can provide us with guidance.

Our cases have identified several factors to consider when assessing the trustworthiness of a hearsay statement, including: the nature and character of the statement; the relationship between the parties to the statement; the declarant's probable motivations for making the statement; and the circumstances under which the statement was made. *People v. Fuller*, 788 P.2d 741, 745 (Colo.1990). We also have taken into account "where and when the statement was made, to whom the statement was made, what prompted the statement, how the statement was made, and what the statement contained." *Newton*, 966 P.2d at 576. In analyzing the trustworthiness of a hearsay statement for Confrontation Clause purposes, the Tenth Circuit has considered the following indicia of reliability: (1) whether the statement is detailed; (2) whether the statement was made voluntarily or was coerced; (3) whether the declarant was in a position to have personal knowledge of the described events in the statement; (4) whether the statement was made soon after the described events; and (5) whether the declarant had a motivation to inculpate the defendant. *Gomez*, 191 F.3d at 1222–23; *see also Earnest v. Dorsey*, 87 F.3d 1123, 1134 (10th Cir.1996) (observing that factors that support a finding of trustworthiness include: (1) whether the statement was truly inculpatory; (2) the amount of detail contained in the statement; (3) whether the statement was made voluntarily, looking at whether law enforcement officers threatened or coerced the confession; (4) whether the confession was obtained in exchange for an offer of leniency; and (5) the mental and physical condition of the accomplice when the confession was made).

■■■■ When evaluating an accomplice's confession, the most important determination as to its trustworthiness is whether the statement at issue is genuinely self-inculpatory or whether it shifts the blame from the confessor to the defendant. *See Lilly*, 527 U.S. at

ity); *Brown v. State*, 953 P.2d 1170, 1179–80 (Wyo.1998) (affirming trial court's admission of portions of accomplice's statements that implicated him equally with defendant); *see also United States v. Dolah*, 245 F.3d 98, 104–05 (2d Cir.2001) (stating that the court has "regularly approved" of the admission of statements from accomplices even when the government has played a role in obtaining them); *United States v. Gomez*, 191 F.3d 1214, 1222 (10th Cir.1999).

146, 119 S.Ct. 1887 (Rehnquist, C.J., concurring) (suggesting that "custodial confessions that *equally* inculpate both the declarant and the defendant" may even satisfy "a firmly rooted hearsay exception under *Roberts*") (emphasis added); *see also Williamson*, 512 U.S. at 605, 114 S.Ct. 2431 ("[T]he very fact that a statement is *genuinely self-inculpatory* ... is itself *one* of the guarantees of trustworthiness that makes a statement admissible under the Confrontation Clause.") (emphasis added); *United States v. Dolah*, 245 F.3d 98, 104 (2d Cir.2001) (viewing *Lilly* as rejecting admission of an accomplice's confession only because it was largely non-self-inculpatory). We stress, however, that an evaluation as to whether a statement is genuinely self-inculpatory is only one of the factors to be analyzed and is not by itself dispositive. *See Williamson*, 512 U.S. at 605, 114 S.Ct. 2431.

In this case, Swiger admitted in his confession that he alone shot and killed the victim. He did not minimize his involvement in the murder nor did he shift the responsibility for committing the murder to the defendant.[7]

Swiger's statements inculpating the defendant are closely intertwined with the self-inculpatory portions of his confession. His description of the defendant's involvement in the murder provided the police investigators with Swiger's motive for killing the victim and explained how Swiger carried out the murder. In addition, Swiger's explanation of how he and the defendant discussed and planned the murder not only inculpated the defendant, it also augmented his own guilt by showing that the murder was premeditated. This dual inculpation distinguishes cases in which the parts of an accomplice's statement inculpating the defendant do not also inculpate the accomplice but rather tend to excul-pate the accomplice by shifting the majority of the blame to the defendant. *See, e.g., Lilly*, 527 U.S. at 121, 119 S.Ct. 1887 (part of accomplice's confession inculpating the defendant served to lessen accomplice's guilt by explaining that the defendant, not the accomplice, committed the murder); *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117, 133 (2000) (accomplice acknowledged he was present during the crime but that the defendant committed the rape and murder).

The only part of Swiger's confession that in any way minimized his culpability was his naked assertion that he could not withdraw from his agreement with the defendant to murder the victim because he believed that if he did so, the defendant would harm his family. Swiger did not provide details about this alleged threat. While such an explanation may be designed to invoke sympathy, it does not diminish the fact that Swiger admitted in his statement that he was solely responsible, without any coercion on the day in question, for driving to the defendant's house and murdering the victim.

Nothing in the record suggests that Swiger thought his claim of coercion would exonerate him. In fact, it is difficult to imagine a more genuinely self-inculpatory statement than that given by Swiger. After being read his *Miranda* rights and being expressly informed that no lenient treatment or deals would be offered, Swiger confessed to police investigators that he committed the premeditated murder of the victim.

Furthermore, the record shows that Swiger was aware that confessing to killing the victim would lead to severe consequences regardless of his motive for committing the murder. Prior to confessing, Swiger stated that his confession would lead to him spending "the rest of my life in jail." Swiger also

---

7. This case is clearly distinguishable from *Lilly*, where the accomplice confessed to being involved in a crime spree with his co-defendants, which included robberies and a murder, but denied any involvement in the murder, the most serious crime committed. *Lilly*, 527 U.S. at 121, 119 S.Ct. 1887. In our view, the confession in *Lilly* was not genuinely self-inculpatory. We also find that many of the cases decided after *Lilly*, which have rejected the admission of a co-defendant's confession, either involved statements that were not genuinely self-inculpatory or statements that were made in the belief that the co-defendant would receive a benefit. *See United States v. Castelan*, 219 F.3d 690, 695 (7th Cir.2000) (co-defendant asked if his assistance would help him); *Gomez*, 191 F.3d at 1223 (co-defendants informed that their cooperation would be beneficial); *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117, 124–25, 133 (2000) (co-defendant's confession inculpated defendant as the person who committed the rape and murder while co-defendant was present).

acknowledged that if he confessed, he would never live with his family again.

Continuing our analysis, we recognize that, as in *Lilly*, Swiger's confession was made to police officers while being interviewed and asked some leading questions. However, we find that this case is clearly distinguishable from *Lilly*. In *Lilly*, the accomplice who made the confession was in custody facing charges after being apprehended for his involvement in a crime spree. 527 U.S. at 121, 119 S.Ct. 1887. Police officers told the accomplice that he was about to be charged and that if he wanted to avoid a life sentence he had "better start talking." *Id.* The Supreme Court stated that, "[w]hen a suspect is in custody for his *obvious* involvement in serious crimes, his knowledge that anything he says may be used against him militates against depending on his veracity." *Id.* at 138, 119 S.Ct. 1887 (emphasis added).

In this case, however, Swiger was not being held in custody in connection with the victim's murder. In fact, two years had passed since the murder, the investigation was inactive, and the police had not interviewed Swiger since his departure from Colorado a few days after the murder. To an objective observer, it would appear that Swiger successfully escaped detection for the crime by fleeing the state and taking with him the only known eyewitness to the crime. Apart from informing Swiger that witnesses had come forward stating that they had heard Swiger bragging about his involvement in a murder, the police investigators did not tell Swiger that they had any other evidence

linking him to the victim's murder. Thus, this case is clearly distinguishable from *Lilly*. *See United States v. Shea*, 211 F.3d 658, 669 (1st Cir.2000) ("*Lilly's* main concern was with statements in which ... the declarant admits *only* what the authorities are already capable of proving against him and seeks to shift the principal blame to another.") (emphasis added). In his statement, Swiger acknowledged that prior to his arrest by Tennessee law enforcement officers he had confessed his involvement in the victim's shooting to acquaintances in Tennessee. Thus, Swiger was not being detained for his involvement in the victim's murder and did not have the same outside pressures that existed in *Lilly* to make a statement to the investigating police officers.[8] Whatever caused Swiger to start talking about the murder in the first place came from within himself and was not the result of government action.

Although police investigators did use some leading questions in the interview, Swiger was not coerced and no improper tactics were used. From the record there is no reason to believe that Swiger's statement was anything but voluntary. The police officers interviewing Swiger expressly informed him on several occasions that he would not receive any deals in exchange for his statement.[9] *See Gomez*, 191 F.3d at 1223 (acknowledging that absence of an offer of leniency is an important indicator of reliability). Furthermore, Swiger did not inquire as to any possible benefit he would receive for cooperating with the investigating officers and making his confession.[10]

---

8. In *United States v. Papajohn,* the court distinguished the case at issue from *Lilly* because the declarant was not arrested or charged with a crime prior to making his statement and therefore did not have "[t]he obvious incentive that the captured accomplice in Lilly had to shift blame." 212 F.3d 1112, 1119 (8th Cir.2000); *see also Brown v. State,* 953 P.2d 1170, 1179 (Wyo. 1998) (fact that accomplice was not under arrest when he made statement and voluntarily continued to provide information after he had been given *Miranda* warnings supported a finding that the statement was trustworthy).

9. The lack of any offers of leniency further distinguishes this case from *Lilly,* in which the confessing accomplice was told that if he did not make a statement he would be facing life imprisonment. *Lilly,* 527 U.S. at 121, 119 S.Ct. 1887.

10. In the course of Swiger's confession, the investigating officers offered to protect his family from possible retaliation from the defendant. However, the record does not support an assumption that Swiger's confession was hinged on this offer of protection, or that the offer was an incentive for inculpating the defendant. A different factual scenario was presented in *Sheets,* where the defendant was in custody for a racially motivated murder, and, as a result, was in fear for his safety while imprisoned. 618 N.W.2d at 132. In exchange for police offers of protection, the defendant in that case offered a confession inculpating a co-defendant and signed a plea bargain agreement that provided for his protection. *Id.*

*See United States v. Castelan,* 219 F.3d 690, 695–96 (7th Cir.2000) (finding that custodial confession lacked inherent guarantees of trustworthiness because declarant asked police investigators if he would benefit from his cooperation).

 Other courts have taken into consideration whether a statement is highly detailed when determining its admissibility under the Confrontation Clause. *Gomez,* 191 F.3d at 1222–23; *Earnest,* 87 F.3d at 1134; *Brown v. State,* 953 P.2d 1170, 1180 (Wyo. 1998). The critical consideration when using detail as a basis for inferring the trustworthiness of a statement is the likelihood that the declarant could have fabricated the details without having witnessed them firsthand. *See, e.g., Dana v. Dep't of Corrections,* 958 F.2d 237, 239 (8th Cir.1992) (finding it unlikely that a four-year-old child could manufacture graphic descriptions of sexual abuse). When considering detail, a court must look for indicia of trustworthiness regarding the reliability of the substance of the statement with the major focus on the parts of the statement recounting the defendant's involvement. *See Earnest,* 87 F.3d at 1134.

Examining the record, we find that Swiger provided many details concerning the murder and the defendant's participation that could be independently confirmed. Swiger described the defendant's motive for wanting the victim dead, i.e., to prevent the victim from testifying in the upcoming trial. Although he knew the defendant for only a short time, Swiger had detailed knowledge regarding how and why the defendant had kidnapped and assaulted the victim. He explained the reasons why the defendant believed that he, Swiger, would be willing to commit the murder, i.e., Swiger's self-described role as an enforcer for a motorcycle gang. Swiger provided details about how the defendant supplied him with the loaded gun used to commit the murder. He also depicted how the defendant dipped the murder weapon in acid and helped him dispose of the gun after the murder was committed. In his statement, Swiger gave detailed directions as to where he and the defendant disposed of the gun. Swiger also described previous plans that the defendant had considered for

murdering the victim. Furthermore, Swiger explained that the murder was executed with the aid of one of the defendant's close associates who called Swiger and informed him, minutes before the murder occurred, when he would have the opportunity to shoot the victim.

Swiger described the actual shooting with specificity. He told of receiving a phone call from Ivey informing him that the victim was about to leave on an errand. He explained that he drove to the defendant's house, parked his car in the alley behind the house, and shot the victim from a position near the back gate. He described firing his gun at the victim as he walked out of the defendant's house toward the defendant's truck. Swiger stated that two shots struck the victim who immediately fell to the ground. From all of this detailed description, there can be no doubt that Swiger was the shooter. Similarly, Swiger displayed a depth of knowledge about the relationship between the defendant and the victim that gives credibility to his claim that the defendant planned the crime.

In our analysis, we must also consider whether the party making the confession had a motive, other than to shift the blame, for inculpating the defendant. *See Gomez,* 191 F.3d at 1222; *Earnest,* 87 F.3d at 1134. Swiger's statement provides us with no reason to believe that there was any animosity between Swiger and the defendant. In the statement, Swiger says that the defendant was one of the first people he met when he moved to Colorado and that he regularly socialized with the defendant. After the murder, the defendant even sent Swiger some money to help him rent a house. We also observe that Swiger's statement contained no hint that any animosity existed between Swiger and the victim prior to Swiger's confession.

We recognize that in his statement Swiger may have attempted to minimize his girlfriend's involvement in the murder. Swiger's assertion that he sent his girlfriend to a liquor store while he performed the murder conflicted with the fact that a licensed liquor store would have been closed on Sunday, the day that the murder occurred. We do not

find, however, that this interest was served in any way by inculpating the defendant and thus this motivation raises no serious concerns regarding the trustworthiness of the part of Swiger's statement that inculpates the defendant.[11] More importantly, Swiger stated that he knew about the 1992 New Year's Eve kidnapping and violent assault carried out by the defendant and his associates against the victim. Therefore, he was well aware that he was inculpating someone who, along with his associates, was very dangerous and would retaliate if crossed. Thus, Swiger knew that his statement could very well put himself and his family in danger, providing Swiger with a strong incentive to avoid inculpating the defendant. That Swiger acted in the face of such knowledge supports a finding of trustworthiness regarding his statement.

Finally, although the record shows that Swiger was very emotional during his confession, there is no evidence that he was mentally or physically unstable. Thus, from our evaluation of Swiger's statement and the circumstances surrounding the making of the statement, we find that it was supported by guarantees of trustworthiness. Most importantly, we find that the statement was genuinely self-inculpatory and was not designed to shift the blame to the defendant or to curry favor with law enforcement officials.

### IV.

In summary, we hold that defendant's rights under the Confrontation Clause were not violated when the trial court admitted Swiger's confession into evidence. We therefore affirm the court of appeals' judgment upholding the defendant's convictions.

Justice BENDER concurs in part and dissents in part, and Justice MARTINEZ joins in the concurrence and dissent.

Justice BENDER concurring in part and dissenting in part.

I agree with the analysis of the majority in Part II, section A, of the opinion holding that

a statement against penal interest is not a firmly rooted exception to the hearsay rule. However, I respectfully dissent from the majority's Part II, section B which holds that the accomplice's statement in this case contains sufficient guarantees of trustworthiness to rebut the presumption that such statements are inherently unreliable. In my view, the accomplice's statement possesses simultaneous indicators of both unreliability and reliability and thereby fails to rebut the heavy presumption of unreliability. As such, the trial court's admission of the accomplice statement violated the Confrontation Clause and, as applied to this case, constitutes constitutional error that is not harmless beyond a reasonable doubt.

This accomplice statement was produced by the government while the declarant was in custody. The circumstances surrounding the taking of the accomplice's statement and the statement itself indicate that cross-examination of the accomplice would at the very least have cast some doubt as to the accomplice's reliability and provided the jury with the accused's perspective when it assessed what weight to give this statement. The statement here suffers from the identical constitutional vices that the United States Supreme Court unanimously condemned in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). In the words of the *Lilly* plurality, accomplice statements implicate the core concerns of the old *ex parte* affidavit practice and thus lack inherent reliability:

> [T]he historical underpinnings of the Confrontation Clause and the sweep of our prior confrontation cases offer one cogent reminder: It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the

---

11. Swiger received no promises of preferential treatment for his girlfriend from the investigating officers, only assurances that if "[Swiger's girl-

friend] had nothing to do with this ... then we're not gonna do anything to her."

statements describe past events and have not been subjected to adversarial testing. *Lilly*, 527 U.S. at 137, 119 S.Ct. 1887; see also John G. Douglass, *Beyond Admissibility: Real Confrontation, Virtual Cross–Examination, and the Right to Confront Hearsay*, 67 Geo. Wash. L.Rev. 191, 228 (1999) ("the 'core' historical purpose of the Confrontation Clause: preventing the inquisitorial practice of trial by affidavit or by *ex parte* examination").

## I. Factual Background

Although I agree with a good deal of the majority's statement of the facts, critical facts necessary to determine whether the accomplice's statement is inherently reliable are omitted from its discussion. Thus, I review these facts to place my dissent in perspective.

The victim was killed in February of 1993 as a result of two gunshot wounds. His body was found in the front yard of the defendant ("Crazy Dave"). Several days after the killing, the police questioned the accomplice, John Swiger (whose nickname was "Dreamer") along with his girlfriend, Bonnie Clontz. Questioned separately, both Swiger and Clontz denied involvement in the killing and both said that at the approximate time of the shooting Bonnie had gone on an errand to the liquor store. At the time, both Clontz and Swiger lived together with their child and other children from Clontz's previous relationships. Swiger later told authorities that he and Clontz told "a fictitious story to

police during this interview." Swiger Statement 24, lines 28–29.

Almost two years later, the Aurora detective who questioned Swiger immediately after the shooting, along with another Aurora detective, traveled to Carter County, Tennessee to interview Swiger who was in custody on unrelated attempted murder and robbery charges stemming from an incident alleged to have occurred ten or twelve days before the interview.[1] The detectives interrogated Swiger for at least two-and-a-half hours, the entirety of which was recorded on an audiotape.[2] The only persons present during this questioning were the two Aurora detectives, a Tennessee sheriff (Potter), and Swiger.[3] The audiotape was played to the jury and a 73 page transcript of the tape was published. In addition, Swiger gave a short statement written immediately after the taped interview which the prosecution also published to the jury. During deliberations, the jury requested a tape recorder, presumably to use in listening to the tape recording of Swiger's interview. These statements of Swiger's formed the basis of the prosecution's case of murder against the defendant.

Before actually conducting their interview, the Aurora detectives talked to Clontz and to two other persons, Louis Holm and James Moody. Both Holm and Moody stated that Swiger admitted the Colorado killing. In addition, Holm told the officers that Clontz also had bragged about killing someone in Colorado and that Swiger said he killed several people in Charlotte. Clontz, herself,

**1.** For background on the defendant and the accomplice, Swiger, I note that the defendant was convicted of a number of crimes directed against the victim in this case before the victim's death: first degree kidnapping, conspiracy to convict first degree kidnapping, second degree assault, criminal conspiracy, menacing, and two counts of crimes of violence. For these crimes the defendant was sentenced to the department of corrections to consecutive terms of eighty years and life. In this murder case, the defendant was convicted of first degree murder, conspiracy to commit first degree murder and solicitation to commit murder. He was sentenced to life imprisonment concurrent with two twenty-four year terms to be served consecutive to the life plus eighty sentence that he received in the prior trial.

Shortly before this trial, Swiger, the accomplice, was acquitted of first degree murder but was convicted of conspiracy to commit first degree murder. Swiger was sentenced to forty-eight years. On appeal, his conviction for conspiracy was affirmed but the court of appeals vacated the sentence and directed the trial court to re-sentence the offender. His sentence is pending appeal. The charges filed against Swiger in Tennessee for kidnapping and attempted murder were not pursued.

**2.** Pursuant to defense motions granted by the trial court, minor portions of the tape and the transcript were deleted.

**3.** The record is unclear as to whether Sheriff Potter was present during the entire interview or whether he joined the interview at some point once it was in progress.

told these detectives that Swiger admitted to her that he killed the victim in this case. The record is unclear as to what details of the murder Clontz gave, but the detectives obtained a tape-recorded statement from her. It is clear, however, that investigators told Swiger, at least four times, that they had spoken to Clontz about Swiger's involvement in the murder.[4]

Near the end of the two-and-a-half hour audiotape, on page 61 of the 73 page transcription, Swiger emotionally admitted killing the victim at the request and direction of the defendant as is fully set forth in the majority opinion. Swiger told investigators that the defendant asked him to commit the murder for $5,000 down and $5,000 after it happened;[5] that the defendant gave him the loaded murder weapon;[6] and that the defendant provided him with $300 after the murder when Swiger, Clontz, and a juvenile eyewitness to the shooting, Tina Parks, had traveled together to Tennessee, a few days after the murder.[7] Swiger said the defendant planned the murder to prevent the victim from testifying against him since the homicide victim was also the kidnapping and robbery victim in a pending criminal prosecution against the defendant.[8]

For the greatest part of the interview, Swiger claimed that while he helped the defendant to dispose of the gun used in the murder several days after the killing, he, Swiger, had nothing to do with the murder. In this part of the interview, before his admission of his own involvement, Swiger told the police eleven times[9] that he had nothing to do with the murder—e.g., "I've never killed anybody, but I'm jus' sure I would remember somethin' like that." Swiger

statement 48, lines 7–8. During this part of the questioning Swiger stated that the defendant told him that "Mike" did the killing, *id.* at 30, lines 4–5. He then described "Mike's" physical characteristics, family life, and residence: "Black guy, great big big guy. Big belly. He lives on an old farm, run, run down shack had a Harley parked out front. Lived with his wife, his two kids, his momma in the house, all of 'em smoked dope. Got a hardwood floor." *Id.*, lines 15–19. Swiger said the defendant told him that "Mike" was the shooter. *See id.* at 29, line 12; p. 30, lines 9, 11.

Swiger also told investigators three times,[10] both before and after his confession of his involvement as the shooter, that Clontz went to the liquor store at the time that the victim was shot. He repeated this assertion in his written statement saying: "I sent Bonnie, after some liquor and smokes." People's Exhibit No. 1. Investigators later determined that these statements were false because the victim was shot on Sunday, February 28, 1993, at approximately 11:00 p.m., when liquor stores in Colorado were closed.

With respect to how much he drank on the day of the homicide, Swiger told the Detectives that he was "quite sure" he had "more than two" (fifths) of whiskey. *Id.* at 50, lines 2–3. Swiger said that the day before he had "done quite a bit" of acid "along with some cocaine." *Id.* at 50, lines 17–19. Nine times[11] on the audiotape Swiger described himself as being drunk on the day of the murder. Additionally, Swiger indicated that in the two weeks prior to the murder he drank at least two bottles of whiskey each day. *Id.*, lines 2–3. During questioning the detectives also suggested to Swiger approximately nine times[12] that he was drunk and

---

4. Swiger Statement 52, lines 2–4; p. 54, lines 12–13; p. 58, lines 1–2; p. 60, line 25.

5. Swiger Statement 66, lines 6–8.

6. Swiger Statement 66, lines 19–23.

7. Swiger Statement 66, lines 1–4.

8. *See supra* note 1 (concerning the result of these charges).

9. *See* Swiger Statement 14, line 19; p. 30, lines 4–5; p. 34, line 17; p. 36, line 4; p. 42, line 22;

p. 48, lines 4, 7–8; p. 51, lines 9–13; p. 52, lines 11, 15; p. 53, lines 19–20.

10. *See* Swiger Statement 32, line 6; p. 44, lines 9–10; p. 62, lines 5–8.

11. *See* Swiger Statement 32, lines 3–4; p. 33, line 16; p. 43, line 17; p. 44, line 14; p. 46, lines 22–23; p. 49, lines 28–31; p. 50, lines 18–19; p. 63, line 1; p. 70, lines 25–26.

12. *See* Swiger Statement 47, lines 4–5, 24–27; p. 48, lines 1–2, 13, 24–25; p. 50, lines 22–23; p. 52, lines 23–28; p. 58, lines 7–8, 22–25.

did not really know what he was doing the night of the killing.

Throughout the entire interview, Swiger told the investigators that he acted out of fear because the defendant would kill him and his family if he backed out. By his family, Swiger meant himself, his mother, who lived in the Denver area, and his girlfriend Clontz and their child. In the early parts of the interview, Swiger stated that he helped the defendant dispose of the gun used to shoot the victim because the defendant threatened his family. In his short written statement, Swiger wrote: "Dave [the defendant] and Cowboy [Cory Ivey's father] told me there was no backing out. That if I didn't. They would kill my family." [13] People's Exhibit No. 1.

Although the tape reveals no specific promises of leniency concerning charges against Swiger for his involvement in this murder, the two detectives twice promised him that they would keep him safe if he confessed,[14] and eight times promised him that they would protect his family.[15] One of the detectives midway through the interview suggested to Swiger that he committed the murder because he was drunk, that he was influenced by the defendant, and that his denials were false.[16] These explanations and variations of this theme culminated in the following thirty-five line "question" by one of the detectives, shortly before Swiger confessed:

> And I think what happened is that you drink a lot, I think maybe you drink 'way too much and you drink hard liquor and I think you did your cocaine and you may have done 'way too much acid and Crazy Dave starts talkin' with you and starts fillin' this stuff in your head, what kind of big man you can be ... and I think it got to you and I think you got drinking too much and you probably 'way down deep didn't want to do this because you're not that kind of guy but all of a sudden you're another guy, you're like two people, and this other guy came out, this tough Dreamer, this tough guy, not the family Dreamer, not the guy who loves Bonnie and those three children, but the other Dreamer, the guy that's 'n that Harley with the gun and the national enforcer. And maybe this other guy comes out and goes and commits this murder....

Swiger Statement 58–59.

During the course of Swiger's interview, investigators indicated to Swiger three times that his alleged co-conspirators might implicate him in the murder: "What's gonna happen, John, the minute your buddy Cory and Crazy Dave and Cowboy, or ex-buddies, I mean if they decide to roll on you, if they haven't already rolled, what's gonna happen then? What kind of a story are you gonna have for us then?" Swiger Statement 57, lines 6–9.[17] They additionally stated to Swiger that it would not be fair for Swiger's co-conspirators to "get away with any of this what they made you do." *Id.* at 59, lines 12–13.

During the trial, Clontz testified that she went to the liquor store that evening. She also said that the only reason that Swiger gave his confession to the Aurora detectives was that Sheriff Potter had threatened to place her children in a foster home. She also told the jury that she implicated Swiger because of this same threat. However, the pros-

---

**13.** Swiger made reference to threats to himself and his family seventeen times in the interview. *See* Swiger Statement 14, lines 15–17; p. 19, lines 16–17 ("[I]t was constantly brought up you know that if I said anything you know that I'd be took care of. The groups would get me."); p. 24, lines 10–13, 28; p. 30, line 25; p. 34, lines 12–13; p. 37, line 9; p. 52, lines 21, 26–27; p. 53, line 5; p. 54, line 25; p. 57, line 16; p. 59, lines 18–20; p. 61, lines 11, 22–23; p. 63, line 3; p. 65, line 8.

**14.** *See* Swiger Statement 54, lines 1–2 and line 13.

**15.** *See* Swiger Statement 53, lines 6, 18, 24–25; p. 54, line 12, p. 57, line 19, p. 60, line 28, p. 62, line 14; p. 67, line 3; p. 72, line 20.

**16.** *See, e.g.,* Swiger Statement 31, lines 15–21; p. 35, lines 18–24; p. 36, lines 24–25; p. 42, lines 16–21; p. 49, lines 12–18; p. 50, lines 22–23; p. 51, lines 1–6; p. 52, lines 22–27; p. 58, lines 7–12; pp. 58–59, lines 16–37, 1–13.

**17.** *See also* Swiger Statement 57, lines 14–15 ("what's gonna happen when Cory decides to roll on you?"); p. 59, lines 15–16 ("guess who's gonna be the fall guy").

ecution impeached this statement with her earlier statement to Potter in which she said that it was Swiger, not Sheriff Potter, who threatened to take her kids away from her. Potter testified that he made no such threats. Clontz also told the jury that she was an excellent marksman, better than Swiger.

## II. Analysis

### A. Constitutional Standard

Before turning to a discussion of whether Swiger's statements possess particularized guarantees of trustworthiness, I write to express my disagreement with five central themes that run through the majority's analysis.

First, throughout the opinion the majority stresses that a genuinely self-inculpatory statement of an accomplice is inherently reliable: "[T]he most important determination as to its trustworthiness is whether the statement at issue is genuinely self-inculpatory or whether it shifts the blame from the confessor to the defendant." Maj. op. at 314; see also maj. op. at 318 ("[m]ost importantly, we find that the statement was genuinely self-inculpatory").[18] According to the weight of United States Supreme Court precedent and that from many other jurisdictions, this conclusion is simply an inaccurate statement of law. The self-inculpatory portions of a genuinely self-inculpatory statement do not prove the truth or reliability of the non-self-inculpatory or collateral statements that inculpate other persons.[19] *Lilly*, 527 U.S. at 138–139, 119 S.Ct. 1887; *Williamson v. United States*, 512 U.S. 594, 599–600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *Lee v. Illinois*, 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514

(1986); *United States v. Castelan*, 219 F.3d 690, 695–96 (7th Cir.2000); *United States v. Gomez*, 191 F.3d 1214, 1221 (10th Cir.1999); *Brooks v. State*, 787 So.2d 765, 775, 2001 Fla. LEXIS 624, *26–27 (Fla.2001); *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117, 133–134 (2000).

Whether an accomplice's statement is self-inculpatory restates the obvious that the statement was against his interest. In other words, to say that a statement is against one's penal interests is sufficient for a hearsay exception analysis but is not sufficient for the more stringent analysis required by the constitution. *Lilly*, 527 U.S. at 138–139, 119 S.Ct. 1887; *United States v. Flores*, 985 F.2d 770, 782 (5th Cir.1993); *State v. Cook*, 135 N.H. 655, 610 A.2d 800, 805 (1992). The fact that a statement shifts the blame or is genuinely self-inculpatory may be an indication that the statement is more reliable than unreliable; however, this factor is not necessarily more important than any other factor used to determine the inherent reliability of an accomplice statement.

As a linchpin to its primary conclusion that a genuinely self-inculpatory confession is inherently reliable, the majority relies on the concurring opinion of Chief Justice Rehnquist in *Lilly*: " 'confessions that *equally* inculpate both the declarant and the defendant' " satisfy the firmly rooted exception to a Confrontation Clause violation. Maj. op. at 315 (quoting *Lilly*, 527 U.S. at 146, 119 S.Ct. 1887 (Rehnquist, C.J., concurring)). *But See, Lilly*, 527 U.S. at 148, 119 S.Ct. 1887 (Rehnquist, C.J., concurring) (failing to reach the

---

**18.** Although the majority contradicts this proposition when it says that "whether a statement is genuinely self-inculpatory is only one of the factors to be analyzed and is not by itself dispositive," maj. op. at 315, a fair reading of the majority leads me to conclude that the majority relies almost exclusively on the self-inculpatory nature of Swiger's statement to hold that it is inherently reliable. *See* Maj. op. at 318.

**19.** Part A of the majority opinion contains citations to some cases where a genuinely self-inculpatory confession was held not to violate the Confrontation Clause. *See* Maj. op. at 313–14, n. 6. Only three of these cases were decided after *Lilly: United States v. Dolah*, 245 F.3d 98, 104–

105 (2d Cir.2001) (refusing to adopt the plurality opinion in *Lilly*, because the Second Circuit has regularly approved of the admission of accomplice statements that are largely non-self-inculpatory); *Gabow v. Commonwealth*, 34 S.W.3d 63 (Ky.2000); *State v. Marshall*, 136 Ohio App.3d 742, 737 N.E.2d 1005 (2000) (recognizing, however, that in *Lilly*, the fact that the accomplice's confession implicated the accomplice did not constitute a particularized guarantee of trustworthiness). Other cases decided since *Lilly*, however, have adopted the principle that the self-inculpatory portions of a declarant's statement do not make the non-self-inculpatory statements more reliable. *See* citations in accompanying text.

issue of particularized guarantees of trustworthiness).

The majority, however, fails to acknowledge that a six person majority of the Court expressly rejected this view in *Williamson* by concluding that simply because the accomplice makes "a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Williamson*, 512 U.S. at 599, 114 S.Ct. 2431. In fact, the six person Court concluded that the proximity of self-inculpatory statements to other, non-self-inculpatory statements does not reveal the truth of the statement because "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Id.* at 599–600, 114 S.Ct. 2431.

Even if I were to agree that the proximity of self-inculpatory statements to non-self-inculpatory statements indicated the inherent reliability of a statement as a whole, my review of Swiger's statements leads me to challenge the majority's conclusion that "Swiger's statements inculpating the defendant are closely intertwined with the self-inculpatory portions of his confession." Maj. op. at 315. Rather, the details of the defendant's involvement in the murder were given to officers primarily while Swiger denied his own involvement. *See* Swiger Statement 13–16 (describing defendant's request that Swiger kill the victim and Swiger's refusal to do so), pp. 18–22 (describing the defendant's efforts to dispose of the murder weapon). Thus I conclude that the bulk of the non-self-inculpatory portions of Swiger's statement do not intertwine with the self-inculpatory parts.

Secondly, I fault the majority for its nominal acknowledgment of the heavy presumption of unreliability that attaches to an accomplice's statement. The majority buries the cases discussing this presumption in footnote 6, maj. op. at 313–14, and mentions this presumption only as part of its discussion of whether a statement against penal interest is

a firmly rooted hearsay exception in section II, Part A. The majority fails to discuss or to apply this presumption in section II, Part B of its opinion when determining whether Swiger's statement is inherently reliable.

The basis for the presumption of unreliability that attaches to an accomplice's statement has been stated repeatedly by the United States Supreme Court and echoed by other courts: *accomplice confessions that incriminate a codefendant are inherently unreliable, particularly if made while the accomplice is in custody*, because such statements "may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *Lee*, 476 U.S. at 545, 106 S.Ct. 2056.[20]

An "accomplice often has a considerable interest in 'confessing and betraying his co-criminals'" once the "jig is up" and he has become an antagonist of his codefendants. *Lilly*, 527 U.S. at 131, 119 S.Ct. 1887 (quoting 5 John Henry Wigmore, *Evidence* § 1477, at 358, n. 1 (1974)); *Lee*, 476 U.S. at 545, 106 S.Ct. 2056; *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 193 (1999). Thus, because a codefendant has a strong motivation to implicate the defendant, either to benefit or exonerate himself, the use of accomplice statements untested by cross-examination constitutes exactly the kind of threat to a fair trial against which the Confrontation Clause was directed. *See Lee*, 476 U.S. at 541, 106 S.Ct. 2056; *Bruton*, 391 U.S. at 136, 88 S.Ct. 1620.

Third, while the majority opinion acknowledges the prohibition against bootstrapping, that an accomplice's statement must "possess 'indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial,'" maj. op. at 314 (quoting *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)), the majority violates this prohibition when it concludes: "Examining the record, we find that Swiger

---

**20.** *See also Lilly*, 527 U.S. at 133, 119 S.Ct. 1887; *Bruton v. United States*, 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (concluding that accomplice statements are "inevitably suspect" and that "[t]he unreliability of such evidence is intolerably compounded when the al-

leged accomplice … cannot be tested by cross-examination"); *Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Flores*, 985 F.2d at 780; *Wilson v. State*, 334 Md. 313, 639 A.2d 125, 137 (1994).

provided many details concerning the murder and the defendant's participation that could be independently confirmed," maj. op. at 317. The use of corroborating evidence of an accomplice's statement to justify admissibility contravenes established precedent. *Wright*, 497 U.S. at 822, 110 S.Ct. 3139; *accord Lilly*, 527 U.S. at 137–38, 119 S.Ct. 1887. Further, it taints the majority's analysis, causing the majority to misperceive whether the accomplice's statement possesses particularized guarantees of trustworthiness as required by the Confrontation Clause.

Fourth, the majority also fails to acknowledge the powerful, controlling precedent of the Supreme Court case *Lilly v. Virginia*. *Lilly* is generally cited with respect to its plurality-of-four decision (Justices Stevens, Breyer, Ginsburg, Souter), which concludes that the admission of the accomplice statement in that case violates the Confrontation Clause for failure of particularized guarantees of trustworthiness sufficient to overcome the presumption of unreliability. Two Justices, Scalia and Thomas, wrote separately to say that in their view all custodial statements made to law enforcement by an accomplice are by their very nature inherently unreliable and admission under any circumstances violates the Confrontation Clause. *See Lilly*, 527 U.S. at 143, 119 S.Ct. 1887 (Scalia, J., concurring); *id.* at 143–144, 119 S.Ct. 1887 (Thomas, J., concurring). Three other Justices, Rehnquist, Kennedy, and O'Connor, agreed that the accomplice's custodial statement in *Lilly* inculpating the defendant lacked sufficient indicia of reliability to satisfy the Confrontation Clause. *Id.* at 148, 119 S.Ct. 1887 (Rehnquist, C.J., concurring). Hence, nine Justices believed that *Lilly's* Sixth Amendment rights were violated, four Justices held that the accomplice's statement lacked the required particularized guarantees of trustworthiness necessary to pass constitutional scrutiny, two supported a blanket prohibition of government produced confessions, and three believed that a determination of particularized guarantees of trustworthiness should be left for the state court to decide.[21]

Considering the impact of the plurality decision and each concurrence, I conclude that the presumption of unreliability that attaches to an accomplice's statement obtained while in custody is rebuttable only in very limited circumstances. In other words, the presumption of unreliability is a "heavy" presumption. *See Gomez*, 191 F.3d at 1222. In my view, the majority errs by not reaching a similar conclusion.

Fifth, and finally, while appropriately relying on the Tenth Circuit case of *United States v. Gomez*, for factors that may indicate inherent reliability of an accomplice's confession, the majority fails to recognize the significant conclusion in *Gomez* which questions whether out-of-court statements that are strongly against a declarant's penal interest but which inculpate a third party *may ever* possess sufficient inherent reliability to satisfy the constitutional mandate after *Lilly*. *Gomez*, 191 F.3d at 1223 ("[A]fter … *Lilly*, it is no longer clear whether considering the degree to which a statement is against penal interest is even permissible."). Indeed, in *Gomez*, the Tenth Circuit notes that none of their earlier cases support a finding of reliability of an accomplice statement that is self-inculpatory where there are "simultaneously strong indicators of unreliability." *Gomez*, 191 F.3d at 1223.

### B. Application of Constitutional Principles

Because I find simultaneous factors of both unreliability and reliability in Swiger's statement, I turn to a discussion of the majority's application of the constitutional principles to Swiger's statement which I find questionable.

The majority distinguishes this case from *Lilly* by saying that although "the accomplice

---

**21.** I note that at least one commentator agrees with my conclusion:

[T]he Supreme Court [in *Lilly*] indicated, more or less explicitly, that the admission of custodial statements to law enforcement personnel against penal interest … whether or not constituting a confession, that incriminate another person should ordinarily be held to have violated the confrontation clause when admitted against such another person in a criminal case. 30B Michael H. Graham, *Federal Practice and Procedure* § 7075 at 667–668(Interim ed.2000); *accord Castelan*, 219 F.3d at 695; *Sheets*, 618 N.W.2d at 132.

[in *Lilly*] confessed to being involved in a crime spree with his co-defendants, which included robberies and a murder, [he] denied any involvement in the murder, the most serious crime committed." Maj. op at 315, n. 7; *see also* maj. op. at 316. While it is accurate that Lilly's brother and co-defendant, Mark, stated that he "didn't have nothing to do with the shooting," 527 U.S. at 121, 119 S.Ct. 1887, Mark did admit being present when the victim was shot, and by this admission he potentially subjected himself to murder charges based either on a felony murder or complicity theory. By emphasizing that Mark Lilly denied that he was the shooter while Swiger admitted to this role, the majority fails to acknowledge that Swiger, as did Mark Lilly, attempted to shift the blame for the murder by naming the defendant as the mastermind of the crime.[22] *See Lilly,* 527 U.S. at 120–21, 119 S.Ct. 1887. Implicating the defendant as the instigator and mastermind of the murder plan, as Swiger did, is a factor that weighs against the inherent reliability of the statement. *Sheets,* 618 N.W.2d at 133 ("A circumstance in which a declarant admits his or her presence and participation in a crime, but indicates that another was the 'mastermind' or primary actor, is one of the more common fact patterns in which courts hold that a declarant's statements inculpating the defendant may not be admitted at trial.").

The majority further distinguishes *Lilly* by stating that at the time Swiger made his statement he "was not being detained for his involvement in the victim's murder and did not have the same outside pressures that existed in *Lilly* to make a statement to the investigating officers." Maj. op. at 316. Although Swiger was not in custody for the Colorado murder, he was in custody for the serious crimes of attempted murder and armed robbery that had allegedly occurred ten to twelve days before this interview. That police officers from Colorado, who had talked to Clontz, were in Tennessee to interview Swiger because of his own statements about the killing suggests that Swiger may have known that he was a suspect at the time of his interview. *See* Swiger Statement 71, lines 23–24 ("I'd already got word 'way y'all were comin' here, that y'all had a tape."). In fact, investigators informed Swiger that he was a suspect in the murder. Swiger Statement 41, lines 18–21 ("[W]e look at you ... [a]s a suspect in this crime."). These circumstances do not suggest that Colorado authorities failed to consider Swiger a serious suspect and had no evidence against Swiger as the majority suggests when it says: "[I]t would appear that Swiger successfully escaped detection for the crime by fleeing the State and taking with him the only known eyewitness to the crime." Maj. op. at 316.

The majority concludes that, unlike in *Lilly,* "apart from informing Swiger that witnesses had come forward stating that they had heard Swiger bragging about his involvement in a murder, the police investigators did not tell Swiger that they had any other evidence linking him to the victim's murder." Maj. op. at 316.

This statement fails to acknowledge that in addition to other witnesses, the interviewing officers told Swiger that they had interviewed his girlfriend, Bonnie Clontz, before talking to him. Officers expressly stated, "[W]e've already talked to Bonnie," Swiger Statement 54, lines 12–13, and "Bonnie's helpin' us," *id.* at 53, lines 6–7. *See also id.* at 52, lines 2–4. When Swiger denied telling Bonnie what happened the night of the murder, one of the officers confronted him: "So Bonnie's lying?" Swiger answered "I don't know 'cause I don't know what Bonnie told you." *Id.* at 58, lines 1–2. Although Swiger may have been unaware of the exact content of Bonnie's statements, he understood that the police had spoken with her and that her statements contradicted his earlier denials of involvement.

---

**22.** Swiger implicates the defendant specifically as the person who offered him and paid him money to murder the victim. *See* Swiger Statement 12, line 31; p. 52, lines 18–19; p. 66, lines 1–6; p. 70, lines 8–13. Swiger also inculpates the defendant as the person who gave him the murder weapon, *id.* at 66, line 19, and who disposed of the gun after the murder, *id.* at 19–22; p. 29, line 2; and p. 64, lines 3–7. Before confessing to the murder, Swiger also implicated the defendant as the person who knew that a man named Mike was the murderer. *See id.* at 29, line 12; p. 30, lines 9, 11.

A factor weighing against inherent reliability occurs when, as in this case, law enforcement officers have already interrogated another witness and thus knew what they were looking for when questioning the accomplice. Similar circumstances to those that occurred here have been found insufficient to rebut the presumption of unreliability of an accomplice confession. *See Lee,* 476 U.S. at 544, 106 S.Ct. 2056 (concluding that accomplice confession was unreliable where "elicited only after [the declarant] was told that [the defendant] had already implicated him"); *Brooks,* 2001 Fla. LEXIS at *26, 787 So.2d at 775 (concluding accomplice confession was unreliable where the accomplice was confronted with inculpatory evidence); *see also Bass v. Commonwealth,* 31 Va.App. 373, 523 S.E.2d 534, 539 (2000) (concluding that factors indicating reliability were that law enforcement lacked knowledge of the declarant's role in the crime confessed and that the accomplice lacked knowledge that he or she had already been implicated in the crime).

Another way in which the majority distinguishes *Lilly* is by noting "the lack of any offers of leniency" in this case whereas in *Lilly,* officers told the defendant's brother "he would be facing life imprisonment" if he did not make a statement. Maj. op. at 316 n. 9. Although it is true that no express offers of leniency were given to Swiger, as in *Lilly,* police officers implied that failure to confess would result in negative consequences to Swiger. Investigators urged Swiger to confess three times, specifically because someone else might "roll" on him.[23]

Additionally, the majority states that "Swiger did not inquire as to any possible

benefit he would receive for cooperating with the investigating officers and making his confession." Maj. op. at 316. This conclusion misstates the facts. Swiger inquired as to benefits he would receive in exchange for his statement when he asked for protection for himself and his family[24] and when he requested leniency for his girlfriend Clontz.[25] Officers responded to both these requests by offering Swiger and his family protection[26] and implying an offer of leniency for Clontz.[27] These factors weigh against the trustworthiness of his statement. *Castelan,* 219 F.3d at 695–696 (concluding that statements by law enforcement that an accomplice could "help himself" by "cooperating," offers of protection, and inquiries by the defendant asking what could be done to help him even without an express offer of leniency, weigh against a finding of reliability); *Sheets,* 618 N.W.2d at 132.[28] In particular, the implied offer of leniency to Clontz suggests unreliability because it gave Swiger a motive to lie about his girlfriend's possible involvement in the crime. Officers promised Swiger that "if Bonnie had nothing to do with this other than lie to me when I first talked to her (pause) then we're not gonna do anything to her." Swiger Statement 61, lines 7–8.

The majority states that "the record does not support an assumption that Swiger's confession was hinged on this offer of protection." Maj. op. at 316 n. 10. I disagree. At the end of the interview, Swiger expressly states his belief that his confession earned his family police protection. When asked if he had been offered anything for his statement, Swiger responds, "jus' that, jus' ahh if

---

23. *See supra* note 17 and accompanying text.

24. Swiger Statement 30, lines 1–3.

25. Just before confessing to the murder, Swiger asks the police, "Do y'all promise to leave [Clontz] outta this the rest of the way?" Swiger Statement 61, lines 2–3.

26. *See supra* notes 14 and 15 and accompanying text.

27. *See* Swiger Statement 61, lines 4, 7–8.

28. The majority distinguishes *Sheets,* which concluded that an offer of protection included in

plea agreement "indicates a strong motive for [the accomplice] to seek to curry favor with authorities" because in that case the defendant feared for his life in prison. *Sheets,* 618 N.W.2d at 132; *see* Maj. op. at 316 n. 10. Even if this were an important factual distinction, it is not present here since Swiger too feared for his life in prison. *See* Swiger Statement 53, lines 26–27 ("If I got in prison up here man I'm a dead man…. I'm dead as soon as I walk in that door."); p. 59, lines 19–22 ("I've done time before. I've seen snitches, you know what this would do to a small man, everybody's gonna be after me.").

I told the truth, my family'd be protected." *Id.* at 72, lines 18–19.

The majority also minimizes the role that the officers' leading questions played in obtaining Swiger's confession. The majority fails to acknowledge the extensive leading questions, or more accurately, statements that the officers made to Swiger. *See* Maj. op. at 315. Before Swiger's admission that he shot the victim, officers offered Swiger their version of the course of events leading to the shooting at least nine times.[29] A statement given in response to officials' leading questions, such as those stated by officers to Swiger, is a factor that weighs against a finding of inherent reliability. *Lilly,* 527 U.S. at 139, 119 S.Ct. 1887; *Lee,* 476 U.S. at 544, 106 S.Ct. 2056; *Castelan,* 219 F.3d at 695; *United States v. Papajohn,* 212 F.3d 1112, 1119–20 (8th Cir.2000); *Sheets,* 618 N.W.2d at 131.

In contrast to such leading statements produced while the declarant is in custody, the spontaneity of a statement is a factor that weighs in favor of a finding of particularized guarantees of trustworthiness. An outburst in response to a non-leading question presumably indicates that the declarant did not have time to fabricate a version of events, thereby reducing the constitutional need for cross-examination to test the reliability of the statement. *State v. Cook,* 135 N.H. 655, 610 A.2d 800, 806 (1992) ("A declarant's spontaneous statements are likely to be reliable because his reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (quotation marks omitted)); *Wilson,* 639 A.2d at 136 (concluding that a statement which was the product of deliberate and particularized police interrogation could not be a spontaneous explanation of events).

The majority attempts to diminish the impact of the numerous leading questions by officers by noting that Swiger admitted to officers that he "had confessed his involvement in the victim's shooting to acquaintances in Tennessee." Maj. op. at 316. This statement misrepresents what Swiger said and why he said it. Swiger indicated to officers that he bragged about involvement in the murder to gain the respect of other bikers while simultaneously denying to those officers any actual involvement in the murder. *See* Swiger Statement 25, lines 15–16 ("I told 'em I did it, made me somebody. They respected me. They feared me."); p. 28, line 25 (denying involvement). Swiger did not indicate to officers that these boasts were true confessions, and thus these statements do not significantly minimize government influence in the making of Swiger's statement.

In short, the government action played a significant role in producing Swiger's confession to shooting the victim: Swiger was in custody on serious felony charges in Tennessee; he knew that investigators had talked to his girlfriend about his involvement;[30] the officers promised safety for himself and his family;[31] the officers promised leniency for any possible involvement his girlfriend might have had in the crime;[32] the officers threatened that Swiger's co-conspirators might "roll" on him;[33] officers intimated that Swiger could receive mental health assistance if he confessed;[34] and Swiger was subjected to a host of suggestive questions by one of the interrogating officers.[35]

---

29. *See supra* note 16 and accompanying text.

30. *See supra* note 4 and accompanying text.

31. *See supra* notes 14 and 15 and accompanying text. At the end of Swiger's confession, he explicitly states that his reason for confessing is that "if I'm gonna say somethin' they might kill a family anyhow, so I had to. At least I know they're safe." Swiger Statement 73, lines 5–7.

32. Immediately before Swiger changed from persistent denials to confessing that he killed the victim, Officer Petrucelli assured Swiger that if he confessed then they would not "drag [Bonnie] in on it." Swiger Statement 61, lines 2–4, 7–8.

33. *See supra* note 17 and accompanying text. Swiger was told that it would not be fair for his co-conspirators to "get away with any of this what *they made* you do." Swiger Statement 59, lines 12–13 (emphasis added).

34. *See* Swiger Statement 58, lines 31, 37 (suggesting that Swiger is "like two people" and "there's a lot of way to help people like that").

35. *See supra* note 16 and accompanying text.

The majority further downplays Swiger's underestimation of his role in the killing by concluding that "[t]he only part of Swiger's confession that in any way minimized his culpability was his naked assertion that he could not withdraw from his agreement with the defendant to murder the victim because he believed that, if he did so, the defendant would harm his family." Maj. op. at 315. Again, I disagree.

Swiger told police, before his confession, that he was not involved with the murder but only helped dispose of the gun. *See* Swiger Statement 13–22. Additionally, Swiger repeatedly stated that he was under the influence of drugs and alcohol at the time of the shooting. He told them that he drank more than two-fifths of whiskey that day and that the day before that he had "done quite a bit" of acid "along with some cocaine." Swiger Statement 50, lines 17–19. He said that, in the weeks before the shooting, he drank at least two bottles of whiskey each day. *Id.*, lines 2–3. Investigators suggested to Swiger that his condition "may help him" minimize his culpability if he had "so much drugs and alcohol in [him] that [he was] not aware of what [his] physical actions are doing or maybe someone could talk [him] into doing something." Swiger Statement 48, lines 14–17.

Thus, I conclude that Swiger attempted to minimize his involvement and put himself in the most favorable light to police by (1) telling them that he was drunk during the shooting, (2) repeatedly claiming, before confessing, that he only helped dispose of the gun, and (3) after confessing, claiming that he did so only because he was afraid that if he did not carry out the murder, the defendant and his cohorts would kill him and his family.

Additionally the majority concludes, "Nothing in the record suggests that Swiger thought his claim of coercion would exonerate him," maj. op. at 315, in part because

"Swiger was aware that confessing to killing the victim would lead to severe consequences," maj. op. at 315. Again, I disagree. While it is true that Swiger understood that confessing may result in life imprisonment, the record also contains evidence that Swiger hoped to mitigate this potential sentence.

In my view, Swiger may have viewed his justification for committing the crimes he did, that is, because of threats of violence directed against him and his family, as mitigating his culpability. He told the detectives no less than seventeen times that he feared for his and his family's safety during the course of his statement.[36] These claims may represent an unsophisticated attempt to establish the defense of duress—a statutory defense available to a person who engages in unlawful conduct because of the threatened use of force upon him or another person. *See* § 18–1–708, 6 C.R.S. (2000); *People v. Maes*, 41 Colo.App. 75, 77, 583 P.2d 942, 944 (1978). As a matter of Colorado law, this defense is not available to a person in Swiger's situation, that is, a person under investigation for a class one felony. *See* § 18–1–708 (providing the defense of duress to offenses "other than a class one felony"). Nonetheless, I find it reasonable to conclude that Swiger's explanation of why he killed someone he hardly knew—that he did it to protect himself and his family—would put him in a favorable light with authorities. It placed "blame on his cohorts, [that] may inure to his advantage." *Lilly*, 527 U.S. at 139, 119 S.Ct. 1887.[37]

The majority concludes that Swiger's statement is "genuinely self-inculpatory" in part because it was obtained after a Miranda advisement. Maj. op. at 315. I note that *Miranda* warnings do not bear on the reliability of the accomplice's statement. *Lee*, 476 U.S. at 544, 106 S.Ct. 2056 (concluding that a finding that a confession was "voluntary for Fifth Amendment purposes ... does not

36. *See supra* note 13 and accompanying text.

37. This is precisely why the Supreme Court has viewed out-of-court accomplice statements with suspicion and has consistently "spoken with one voice in declaring presumptively unreliable ac-

complices' confessions that incriminate defendants." *Lee*, 476 U.S. at 541, 106 S.Ct. 2056; *see also Lilly*, 527 U.S. at 133, 119 S.Ct. 1887; *Bruton*, 391 U.S. at 136, 88 S.Ct. 1620; *Douglas*, 380 U.S. at 419, 85 S.Ct. 1074; *see also Flores*, 985 F.2d at 780; *Wilson*, 639 A.2d at 137.

bear on the question of whether the confession was also free from any desire, motive or impulse [the accomplice] made have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate [the defendant's] involvement"); *accord, Lilly,* 527 U.S. at 138, 119 S.Ct. 1887; *Sheets,* 618 N.W.2d at 134.

Additionally, although a statement that describes a crime in a level of detail suggests reliability,[38] a detailed description could simply be an elaborate lie, and thus should only be one of a number of factors considered as indicia of inherent reliability. *People v. Turcotte–Schaeffer,* 843 P.2d 658, 662 (Colo. 1993). For instance, before Swiger confessed to the murder of the victim, he described in detail the appearance, residence, and family of the "real" shooter, Mike:

Officer: You don't know anything else about this Mike?

Swiger: No, sir, I ... Mike in Oklahoma when I was down there.

Officer: White guy, black guy?

Swiger: Black guy, great big big guy. Big belly. He lives on an old farm, run, run down shack had a Harley parked out front. Lived with his wife, his two kids, his momma in the house, all of 'em smoked dope. Got a hardwood floor.

Swiger Statement 30, lines 12–18. Further, at least one state court has held that a high level of detail in a statement does not overcome the strong presumption of unreliability which attaches to a statement made in police custody where the declarant had a motive to curry favor with authorities. *Sheets,* 618 N.W.2d at 135.

The majority concludes that Swiger's statement is inherently reliable because it "provides us with no reason to believe that there was any animosity between Swiger and the defendant." Maj. op. at 317. Again, I disagree. Swiger said repeatedly that he lived in fear that the defendant and his cohorts would kill him and/or his family if he

failed to commit the murder or reported it to authorities. If true, to me this suggests a great deal of animosity between Swiger and the defendant. In addition, Swiger showed signs of antagonism towards the defendant when he agreed with police officers that the defendant should not get away with this murder. Swiger Statement 59, lines 13–14. Antagonism between an accomplice and a defendant indicates the "jig is up" and that the accomplice has an interest in betraying a co-conspirator. *See Lilly,* 527 U.S. at 131, 119 S.Ct. 1887.

Later in its opinion, the majority states that "Swiger knew that his statement could very well put himself and his family in danger, providing [him] with a strong incentive to avoid inculpating the defendant. That Swiger acted in the face of such knowledge supports a finding of trustworthiness." Maj. op. at 318. I suggest that these conclusions are contradictory: that Swiger made incriminatory statements despite fear of harm to his family appears inconsistent with the conclusion that there existed no animosity between Swiger and the defendant.

Regarding Swiger's repeated lies about Clontz's trip to the liquor store,[39] the majority reasons that these fabrications "raise[ ] no serious concerns regarding the trustworthiness of the part of Swiger's statement that inculpates the defendant." Maj. op. at 318. However, the fact that an accomplice lies about the role of a potential accomplice or co-conspirator raises serious concerns about the credibility of his statement inculpating another in the crime. *See State v. Madrigal,* 87 Ohio St.3d 378, 721 N.E.2d 52, 63 (2000) (finding statement contained no elements of trustworthiness where defendant admitted that he had lied).[40]

The majority asserts that Swiger's statement is inherently reliable in part because "although the record shows that Swiger was very emotional during his confession, there is no evidence that he was mentally or physical-

---

38. See *Earnest v. Dorsey,* 87 F.3d 1123, 1134 (10th Cir.1996) (concluding that the level of detail in a confession suggests reliability); Sheets, 618 N.W.2d at 135 (same); *Brown v. State,* 953 P.2d 1170, 1180 (Wyo.1998)(same).

39. *See supra* note 10 and accompanying text.

40. When asked if he told a "story to the cops that's not true," Swiger replied, "Yes Sir." Swiger Statement 24, lines 27–28.

ly unstable." Maj. op. at 318. While the degree of agitation of a codefendant may in some circumstances be indicative of the reliability of his statement,[41] in my view the majority's conclusion is too sweeping. The fact that the declarant was agitated or crying at the time he made his statement might indicate either that his statement is credible or that it is untrustworthy. Without an opportunity to observe Swiger's demeanor when he made this statement from a video recording or at least hear the audio recording of it, I believe it is impossible for us as an appellate court, to conclude whether the declarant's agitation weighed in favor of or against the inherent reliability of his statement.

Although the self-inculpatory nature of Swiger's statement, his detailed description of the crime and his understanding that his confession could result in a lifetime sentence of imprisonment present indicia of reliability, the statements possess equally, if not stronger, indicia of unreliability. Swiger was in custody for serious crimes at the time he made his statement; he implicated the defendant as the mastermind of the murder; he repeatedly lied about his and Clontz's involvement in the murder; his confession was made in response to leading questions by government authorities who had other evidence of Swiger's guilt and knew what they were looking for; he asked for and received offers of police protection; he asked for and obtained a no prosecution promise for Clontz; and he attempted to minimize his role and shift blame to the defendant by saying he was drunk and participated only because of fear for his own safety and that of his family.

Six of the Supreme Court Justices have agreed it is highly unlikely an accomplice statement will contain particularized guarantees of trustworthiness sufficient to rebut the heavy presumption against its admissibility in a criminal trial against the defendant. My application of the factors indicating inherent reliability leads me to conclude that Swiger's confession is not one of the rare accomplice statements that rebuts the presumption of unreliability. However, even applying the majority's grudging view of the presumption of unreliability, in other words, not affording the presumption much weight, the simultaneous existence of indicia of unreliability and reliability in Swiger's statement dictate that this presumption is not overcome. *See Gomez,* 191 F.3d at 1223 (concluding that where there are simultaneous indicators of both reliability and unreliability, the presumption of unreliability is not rebutted). In my view, the factors indicating reliability are at least counterbalanced by stronger indicia of unreliability. Hence, the admission of this statement in the defendant's trial violated the Confrontation Clause.

## C. Cross–Examination

Before considering whether the admission of Swiger's confession was harmless constitutional error, I pause to express my disagreement with the majority's implicit conclusion that cross-examination of Swiger would have been of marginal utility. *See* Maj. op. at 311 ("The Confrontation Clause only permits the admission of hearsay evidence where the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." (quotation marks omitted))

As one of the leading treatises on evidence puts it: "For two centuries, common law judges and lawyers have regarded the opportunity of cross-examination as an essential safeguard of the accuracy and completeness of testimony." 1 John W. Strong, et al., *McCormick on Evidence* 87–88 (5th ed.1999). The Confrontation Clauses of both the Colorado and federal constitutions have been construed to guarantee the accused's right to cross-examination in criminal proceedings.[42] *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *People v. Bastardo,* 191 Colo. 521, 524, 554 P.2d 297, 300 (1976). The framers of the Constitution sought to prohibit the use by the Govern-

---

**41.** *See Lilly,* 527 U.S. at 139, 119 S.Ct. 1887; *Gomez,* 191 F.3d at 1223; *Cook,* 610 A.2d at 805.

**42.** *See* U.S. Const. amend. VI ("In all criminal prosecutions the accused shall enjoy the right . . .

to be confronted with the witnesses against him. . . ."); Colo. Const., art. II, § 16 ("In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face. . . .")

ment of *ex parte* affidavits by providing the accused the right to confront his accusers in order to test their truth-telling capacities. In the words of the United States Supreme Court, the primary purpose of the Confrontation Clause is to

> prevent ... *ex parte* affidavits, ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox*, 156 U.S. at 242–43, 15 S.Ct. 337.[43]

"There are few subjects, perhaps, upon which [the] Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Lee*, 476 U.S. at 540, 106 S.Ct. 2056 (quoting *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)). Supreme Court opinions are replete with references to the historical importance of the Confrontation Clause. *See e.g., Lilly*, 527 U.S. at 140–41, 119 S.Ct. 1887 (Breyer, J. concurring) ("The right of an accused to meet his accusers face-to-face is mentioned in, among other things, the *Bible*, Shakespeare, and 16th and 17th century British statutes, cases

and treatises."); *Coy v. Iowa*, 487 U.S. 1012, 1017–18, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) ("The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it."); *California v. Green*, 399 U.S. 149, 157 n. 10, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).[44]

The accused's right to confront and cross-examine adverse government witnesses "contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails." *Lee*, 476 U.S. at 540, 106 S.Ct. 2056. "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.' " *Coy*, 487 U.S. at 1017, 108 S.Ct. 2798 (quoting *Pointer*, 380 U.S. at 404, 85 S.Ct. 1065). In addition, this right secures a functional right by promoting reliability in criminal trials. The right of confrontation advances the jury's pursuit of truth because it forces the witness to submit to cross-examination, the *"greatest legal engine ever invented for the discovery of truth."* *Green*, 399 U.S. at 158, 90 S.Ct. 1930 (emphasis added).[45]

When a witness testifies in person and is subject to adversarial testing, then the jury has the opportunity to assess the demeanor of the witness and to assess whether the witness's direct testimony withstood the rigors of cross-examination. "[C]ross-examination [is] designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which

**43.** *See also Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.").

**44.** What was true of old is no less true in modern times. President Eisenhower once described face-to-face confrontation as part of the code of his hometown of Abilene, Kansas. In Abilene, he said, it was necessary to "[m]eet anyone face to face with whom you disagree. You could not sneak up on him from behind, or do any damage to him, without suffering the penalty of an outraged citizenry.... In this country, if someone dislikes you, or accuses you, he must come up in front. He cannot hide behind the shadow."

*Coy*, 487 U.S. at 1017–18, 108 S.Ct. 2798.

**45.** For two centuries past, the policy of the Anglo–American system of evidence has been to regard the necessity of testing by cross-examination, the "truth" of direct examination as a essential portion of the trial. Not even the abuses, the misunderstandings, and the puerilities which are so often found associated with cross-examination have availed to nullify its value. It may be that in more than one sense, it takes the place in our system which torture occupied in the medieval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever invented for the discovery of truth.

Larry S. Pozner, Roger J. Dodd, *Cross–Examination: Science and Techniques* 2 (1993) (quoting 5 Wigmore, *supra* § 1367).

jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quoting *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *cf. People v. Dist. Court,* 933 P.2d 22, 25 (Colo.1997)("[D]uring cross-examination, facts may be brought out tending to discredit the witness by showing that his testimony is untrue or biased.")). In this fashion, our system serves the dual masters of fairness and reliable fact-finding.

By cross-examination a party is entitled to attack the credibility of facts which an adverse witness was called to prove:

> In criminal cases, the right of cross-examination extends beyond the subjects testified to on direct testimony and includes the right to examine a witness on any facts tending to refute inferences or deductions arising from matters testified to on direct examination.

*Commonwealth v. Green,* 525 Pa. 424, 581 A.2d 544, 558–59 (1990).

Looking at Swiger's out-of-court statement and his background, I suggest that he represents a classic example of a witness whose truth-telling might be called into serous doubt by cross-examination.[46]

The cross-examination could portray him as a man who led a life of violent crime—he committed unrelated felonies of escape, kidnapping and armed robbery. As part of this criminal life, he lied, he made excuses, and he blamed others so that he could gain some benefit for himself. The defendant's advocate could demonstrate specifically how Swiger's statement to police reflects this lifestyle of deception.[47] He lied to police in Aurora about the killing. Two years later, he repeated this lie to the same officer at least fifteen times. Even after admitting his involvement, he continued to lie to police about the involvement of his girlfriend in the killing—that she went to the liquor store on a Sunday evening at the time of the shooting.

Further, questioning might elicit facts to show how Swiger manipulated others to protect himself. For example, when asked by the Aurora Detectives whether he had sex with Tina Sparks, the sixteen-year-old eyewitness to the shooting, who drove to Tennessee with him and Clontz shortly after the shooting, he admitted he did but added "she told us she was seventeen."[48] After the taped interview ended, Swiger told one of the Aurora officers that the Tennessee felony charges then pending, and in which a judge found probable cause, were false because he acted in self-defense. In short, Swiger could readily be depicted as leading a life of violent crime in which being truthful was but a hindrance.

Had Swiger testified in person, his account would have been tested along these lines of inquiry and, undoubtedly others, as well. He would have had to face the defendant. The jury would have had the opportunity to assess his credibility by his demeanor and the way he answered questions. None of this, of course, occurred. Instead the jury heard only Swiger's voice and those of the police officers. There was no representation of the

---

**46.** For example, see the devastating cross-examination of a hitman who testified for the People on direct in a homicide prosecution that he had been hired by the defendant. This cross-examination, which effectively undermined the hitman's credibility begins as follows:

> Defense Counsel: You consider yourself an honest man Mr. Bernardini?
> Mr. Bernardini: I'm a very honest man, with a lot of integrity.

Pozner, *supra* note 45 at 617.

**47.** *See* Albert J. Krieger, The Fine Art and Pure Science of Tailor–Made Cross–Examination, 7 BNA CrimPracMan 547 (Oct. 2, 1993) (providing techniques for cross-examination to insure that all opportunities to erode the opponent's case and enrich one's own case are recognized); Terence MacCarthy, *The Science of Cross Examination* (American Bar Association 1992); Michael E. Tigar, *Examining Witnesses,* Chs. 8–10 (1993); Pozner, *supra* note 45; Francis L. Wellman, *The Art of Cross Examination* 148 (1969).

**48.** This statement also suggests that Swiger was familiar with Colorado sexual assault laws. *See* § 18–3–402(1)(e), 6 C.R.S. (2000) ("Any actor who *knowingly* inflicts sexual intrusion ... on a victim commits sexual assault if: ... [a]t the time of the commission of the act, the victim is at least *fifteen* years of age but less than *seventeen* years of age and the actor is at least ten years older than the victim and is not the spouse of the victim." (emphasis added)).

accused present during this *ex parte* conversation, which was, of course, unverified.

By stating that Swiger and his statement were vulnerable to effective cross-examination, I do not mean to suggest that Swiger was not in fact telling the truth. When he confessed to the detectives, he may very well have told the truth. Certainly, a deceitful person may be truthful. However, this possibility should not cause us to lose sight of one of the mainstays of our criminal justice system: the jury must not be deprived of judging an accuser's truth-telling capacity and the defendant must not be deprived of his right to subject his accuser to adversarial questioning. We will never know the impact of Swiger's cross-examination because none occurred for the benefit of the defendant and the jury that voted to convict him.

In my view, the cross-examination of Swiger would not have been of marginal utility. If his accusations were to be treated as evidence, fairness to the defendant and fairness to the jury that convicted him demanded his presence.

### III. REVERSIBLE ERROR

Lastly, I address the issue of whether the admission of Swiger's statement was harmless beyond a reasonable doubt. The United States Supreme Court has applied constitutional harmless error analysis to Sixth Amendment confrontation cases. *See Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. Under our case law, the standard for constitutional harmless error is that an appellate court must be confident beyond a reasonable doubt that the error did not contribute to the jury's verdict:

> A constitutional error is harmless when the reviewing court is confident beyond a reasonable doubt that the error did not contribute to the verdict obtained. The inquiry is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to error.

*Griego v. People,* 19 P.3d 1, 8–9 (Colo.2001) (citations and quotation marks omitted).

The accomplice's confession was central to the prosecution's case. The jury heard the two-and-a-half hour audiotape of the interrogation, and, during deliberations, requested a tape player to assist them in reaching their verdicts.

Thus, I am not confident beyond a reasonable doubt that the error of admitting Swiger's confession did not contribute to the defendant's conviction. I would reverse the defendant's convictions and remand for a new trial.

I am authorized to state that Justice MARTINEZ joins in this concurrence and dissent.